RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHARTER COMMUNICATIONS, INC.,
                    *Petitioner/Cross-Respondent*,

            *v.*                                            ⎤
                                                           ⎟  Nos. 18-1778/1895
                                                           ⎟
NATIONAL LABOR RELATIONS BOARD,
                    *Respondent/Cross-Petitioner*.          ⎦

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
Nos. 07-CA-140170; 07-CA-145726; 07-CA-147521.

Decided and Filed:  September 25, 2019

Before:  SILER, STRANCH, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Henry E. Farber, Matthew R. Jedreski, DAVIS WRIGHT TREMAINE LLP, Bellevue, Washington, Andrea J. Bernard, Matthew T. Nelson, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, for Petitioner/Cross-Respondent.  Linda Dreeben, Kira Dellinger Vol, Eric Weitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

        STRANCH, J., delivered the opinion of the court in which SILER, J., joined, and NALBANDIAN, J., joined in part.  NALBANDIAN, J. (pp. 28–32), delivered a separate opinion concurring in part and in the judgment.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.  Jonathan French created pro-union flyers and asked a union organizer to distribute them at his workplace, Charter Communications, Inc. (Charter or the Company).  Three months later, Charter fired French and two of his colleagues, James DeBeau and Raymond Schoof.  In the intervening period, all three employees were temporarily reassigned to more isolated regions, and Charter supervisors watched French closely, warned him that the Company was aware of his undisclosed pro-union activities, and threatened him with discharge.

The National Labor Relations Board (NLRB or the Board) concluded that Charter repeatedly violated the National Labor Relations Act (NLRA or the Act) during that three-month period.  The Board also found that French was discriminatorily discharged because of his union activity and that DeBeau and Schoof were discriminatorily discharged because of their perceived union activity.  Charter petitions for review of these decisions.  The General Counsel for the Board, on behalf of French, DeBeau, and Schoof, cross-petitions for enforcement.  Because substantial evidence supported the Board's decisions, we **DENY** the petition for review and **GRANT** the cross-petition for enforcement.

## I.  BACKGROUND

### A.  Union Handbilling and the Aftermath

The parties dispute what happened in the summer and fall of 2014.  The record created by the administrative law judge (ALJ) and adopted by the Board establishes the following.

Until October 2014, French worked as an auditor at Charter, a company providing television, internet, and telephone services.  As an auditor, his job was to visit addresses of Charter subscribers and confirm they received only those services for which they paid.  French and a few Charter technicians (who install equipment and resolve service problems) decided that

unionization might help them all receive better pay. So, in the spring of 2014, French reached out to a local chapter of the International Brotherhood of Electrical Workers (IBEW).

After speaking to an IBEW organizer, French and his wife created a set of pro-union flyers; one of his wife's coworkers distributed the flyers at a Charter office in Bay City, Michigan. That first round of flyers failed to generate responses, in part because Charter supervisors removed the flyers from unattended vehicles. French then suggested that the union handbill (that is, personally distribute flyers) outside his Charter office in Saginaw.

From approximately 8 to 9:30 a.m. on July 15, 2014, as the technicians were arriving for their weekly meeting at the Saginaw office, the union organizer and his team passed out the handbills French had made. Two supervisors heard the technicians talking and went outside. One of those supervisors, Shawn Felker, oversaw the region's auditors, including French, DeBeau, and Schoof. Felker called his boss, T.J. Teenier, manager of all the auditors and technicians in Michigan, who immediately drove to Saginaw from his office 15 to 20 minutes away in Bay City. Teenier also called *his* boss, Regional Director Greg Culver. According to Teenier, Culver instructed him "to pay attention to who's taking the flyers" and "to take notes if possible."

Meanwhile, the two supervisors observed the handbilling. When an auditor on Felker's team drove into the lot and spoke briefly to the organizers, Felker walked directly to the auditor's vehicle and asked if he had taken a flyer. He had not. The two supervisors remained outside, watching. When Teenier arrived, he reiterated the instructions to "take notes" and see "who is paying attention and who seemed to be generally interested." Though neither supervisor took written notes, Teenier testified that one passed on a couple names. That supervisor denied he had done so.

The union activity prompted a series of management conference calls. During a call no more than a day after the handbilling, a regional vice president directed Teenier "to meet with Jon French because his name had c[o]me up as being a possible instigator for the union activity." Company notes from the call state that French "is trouble" and end with a note: "TJ – talk to Jonathan French."

Pursuant to that direction, Teenier visited French in the field the day after the handbilling. He invited French into his car and, in his words, "tr[ied] to figure out if [French] was involved with the union." Teenier testified that he told French that he was being looked at closely by members of upper management and that if he was involved with the union, it will bring a lot of unwanted attention onto himself and to the team. Teenier urged that if there was anything French needed to discuss, he should bring it to Teenier's attention. French could not recall the conversation verbatim, but explained that he felt uncomfortable because Teenier was asking if French "knew of anyone that did anything with union stuff" or could give names of any employees. Notes from the next day's conference call indicate that Teenier told French and a pro-union technician French had been in contact with that both their names were brought up.

On July 17, two days after the handbilling, Teenier's boss, Culver, took French for an unscheduled ride-along (or ride-out). Culver testified that it was his practice as a new manager to go on ride-alongs two to three times a month, whenever time allowed, joining auditors and technicians in the field for a few hours or a day. But no one had done a ride-along with French before (or after) that day, and both Felker and Teenier considered it unusual for a regional director like Culver to go on an unscheduled, one-on-one ride-out. French suggested to Culver that he was there "because of the mutiny . . . a couple of days ago." Culver demurred but, according to French, eventually steered the conversation to the topic of employee complaints. French testified that he refused to tell Culver any names but was willing to discuss a concern among the technicians about how they were being evaluated. This evaluation process was not personally relevant to an auditor like French. The next day, Culver emailed senior management officials that French "talked about things he had no reason to be involved with."

The management conference calls continued. In late July, the same vice president who prompted Teenier's meeting with French instructed Teenier to isolate the employees and keep them away from other technicians and other audiences. Teenier reassigned all four auditors on French's team (including DeBeau and Schoof) to rural areas on the outskirts of Saginaw. The move made their work harder, more isolated, and more distant from their homes. And although the auditors sometimes worked in these outlying areas, DeBeau found his transfer odd because he had just finished auditing one area he was sent to. When he brought up the oddity, Teenier

told DeBeau that the transfer was to keep the field auditors separated so that they wouldn't talk about the union activity. In the meantime, Charter scheduled several weeks of mandatory union avoidance meetings.

By August, most of the transferred auditors had returned to work in Saginaw. According to two Charter officials, the union worries were dying down, with union-related calls ending in early August. Teenier disagreed, maintaining that though calls became less frequent, they continued through September and perhaps October.

In early September, Teenier belatedly complied with an order Culver had given him several months before to even out the size of his supervisors' teams. Felker, who supervised French, DeBeau, and Schoof, had a larger team than the supervisor covering the region immediately to the north, Rob Lothian. When Teenier explained the transfer, Felker suggested that Teenier move French, in addition to DeBeau and Schoof, so that the union spotlight was off of Felker's team. Teenier agreed. When the switch was announced, Felker heard Lothian mumble, you're giving me "the problem child" and "the guy that caused all th[e] union problems." Teenier disagreed, saying Lothian was pleased to have three of the best guys in the state on his team.

The record reveals that Lothian, who did not testify, had reason to be both pleased and concerned. French, DeBeau, and Schoof all had outstanding productivity statistics and no history of discipline. But Teenier had been displeased with Lothian's recent performance and indicated his hope that the extra responsibility might encourage Lothian to retire.

## B. Human Resources Investigation

Just over two weeks after the transfer, on September 19, Lothian went to Charter's human resources department and spoke to Stephanie Peters. After discussing an unrelated matter, Lothian listed an array of complaints about Teenier, Felker, and his three new auditors. Based on the report that Peters later generated summarizing the conversation, Lothian was concerned that Teenier had "built his own little world," populated with close friends and operated without

regard to normal company policy.[1] Lothian claimed that Teenier pulled those friends to work on special projects, which caused those employees to have bad productivity statistics—statistics that would now reflect poorly on Lothian.

Lothian told Peters that he had heard from Felker about one special project DeBeau and Schoof had worked on a week before. Lothian alleged that Felker had a photo of DeBeau, Schoof, and Teenier laying sod at Schoof's home on company time (Lothian did not explain to Peters how he knew when the photo was taken, though the ALJ noted that "[c]ellphones generally show the time and date a picture was taken."). Lothian also said that DeBeau and Schoof fixed plumbing at one of Teenier's rental homes during work hours. In a follow-up conversation a week later, Lothian complained that DeBeau had been pulled for a special project, cleared by Felker, working at a haunted house run by the owner of a car repair shop affiliated with Charter. Peters told Lothian that she would involve the appropriate individuals and that their conversations should remain confidential.

Shortly after that conversation, Peters received a call from Regional Director Culver. Peters described the allegations Lothian had made just moments before. The two agreed to meet and, together, drew up a list of employees to interview. The investigation started in earnest immediately after that meeting. Over the next week and a half, Peters (often with Culver) conducted a series of interviews regarding some—though not all—of Lothian's accusations. Culver himself rejected Lothian's claim that French, DeBeau, and Schoof had bad statistics; he reported before the interviews began that the team's numbers were outstanding. And Peters appears to have ignored some of Lothian's vaguer accusations, such as lining the baseball fields on company time and unnecessarily borrowing drill bits. She focused on three of the special project charges: the sod laying, the haunted house, and the rental home repair.

When questioned about the sod, DeBeau, Schoof, and Teenier readily agreed that they laid sod at Schoof's house several weeks before. But all three told Peters that they started after work hours, between 5 and 6 p.m., and none were aware of any photos. Felker, Lothian's source, stated that he knew nothing about laying sod but if it was happening, it would happen after

---

[1]Like the ALJ, we do not fully credit Peters's report. We nonetheless reproduce its contents in detail because Charter states that the report formed the basis for its subsequent termination decisions.

hours.  When asked about photos, he initially offered his phone, then retracted it, scanned its contents, and denied taking any pictures.  Peters never saw the photo of sod laying that Lothian had initially described, and at a later hearing, Felker testified that his only photo of the sod was taken two weeks after the work was completed.

When Peters asked DeBeau about the haunted house, he explained that as he was waiting for his Charter van to be fixed, the owner of the repair shop (and the haunted house) asked DeBeau to go to the house to prepare a list of plumbing repairs.  Because he was there anyway, he did.  Peters asked if DeBeau had been on his lunch at the time; he said no.  Peters did not ask if a supervisor granted him permission; Teenier later told Peters that he had approved DeBeau's request.  Peters also did not ask if DeBeau worked eight hours that day; he testified at the hearing that he did.  As for the rental home repair, Teenier's tenant (himself a Charter employee) was unaware of anyone from the department working on the house.  Both he and Teenier told Peters that the needed repairs had yet to be completed.

Meanwhile, on September 30, the same day that Peters interviewed DeBeau and Schoof, Lothian met with French for a routine safety check—and stayed for an extended conversation. Lothian recounted his complaint to human resources about Felker discovering DeBeau, Schoof, and Teenier laying sod on company time.  Lothian told French that he had been "outed as the union mastermind" and should get on Lothian's side with this because "people were going to get fired," adding that long ago, he became a supervisor by "squashing a union drive."  Lothian then discussed his finances and retirement prospects.  Over the course of the two-hour conversation, Lothian may have said that he sometimes brought a gun to work.**[2]**

The next night, French called Schoof to discuss the conversation.  Because Peters had told Schoof the day before that the investigation was confidential, Schoof called Peters to tell her what French had relayed about Lothian's statements.  He told Peters how French kept saying that Rob Lothian had sat down with French for about two hours and told French everything.

---

**[2]**The ALJ made a factual finding that Lothian discussed having a gun with French during the safety check. French's statements about whether Lothian had or discussed a gun during the safety check were inconsistent.

By the time she received Schoof's evening call, Peters had already scheduled an interview with French for the following morning. When that interview began, French told Peters what he had told Schoof the night before: that he already knew what was going on because Lothian told him everything about the investigation. French also relayed that Lothian told him about the gun. Under further questioning, French clarified that he had not seen a gun during that conversation but that he did see a gun that Lothian brought to work earlier, when French was a contractor and working for Charter. French went on to describe Lothian's fear of being fired, the supposed pictures of DeBeau and Schoof laying sod, and Lothian's concerns about Teenier's favoritism. French did not, however, have any firsthand knowledge of the three special projects.

The next day, Peters called Lothian. She asked Lothian if he had talked with Jon French this week and if so, whether he disclosed anything about the investigation. Lothian said no and that he seldom talked to French because of French's union involvement. Peters also asked if Lothian had brought a gun on company property or had a gun in his Charter vehicle this week. Lothian denied that as well, saying he had brought a gun to work only once, years before, in the trunk of his personal car.

As Peters continued to interview Charter employees about Lothian's special project allegations, she did not ask any questions regarding French's gun allegation. The hearing record, however, contains the following. Schoof testified that Lothian had shown him a derringer Lothian kept in his work vehicle. Felker testified that he saw Lothian with handgun ammunition at work on multiple occasions and that Lothian once went gun shopping during work hours. And another auditor testified that Lothian showed him a rifle that Lothian was keeping under his desk and that, another time, the auditor saw the outline of a derringer in Lothian's pocket.

During the final days of her investigation, Peters called Lothian again. This time, under specific questioning, Lothian agreed that he had done a safety check with French the week before, but maintained the check had been a normal, half-hour inspection. Lothian continued to deny speaking with French about the investigation or showing French a gun during the conversation. Two days later, as the final act of her investigation, Peters reviewed Lothian's disciplinary history and found that Lothian had been disciplined for having a gun at work in May 2000, six years before French began to work as a contractor for the Company. Peters concluded

that the disciplinary time frame did not coincide with the incident French referenced in his interview. Peters then finalized her report and met with senior officials to describe her recommendations. Culver was among the decisionmakers who reviewed her report; he had also joined five of her interviews and seen the report several times during the investigation.

On October 14, three months after the union handbilling and three weeks after Lothian brought his complaint to human resources, Charter fired five employees: French, DeBeau, and Schoof; as well as their bosses, Teenier and Felker. The termination notices for French, DeBeau, and Schoof stated only that they were fired for "Violation of Charter's Code of Conduct" and "Violation of Charter's Employee Handbook"; DeBeau's added "Violation of Charter's Timekeeping Policy." The form notices contained no other information or description of the violations. All three auditors asked Peters why they were being fired and received no answer.

**C. Procedural History**

French, DeBeau, and Schoof filed charges with the Board alleging discriminatory discharge in violation of the NLRA. French also alleged discrimination related to Lothian's comments during the September 30 safety check. French subsequently amended his charge to allege additional violations of the Act based on his supervisors' conduct during and after the union handbilling.

After a multi-day hearing, the ALJ upheld most of French's claims, determining that his termination had violated the Act, as had the meetings with Teenier and Culver after the handbilling, his reassignment to rural areas, and Lothian's comments during the safety check. The ALJ did not find a violation, however, with regard to Charter surveillance of the handbilling. The ALJ also denied DeBeau and Schoof's discriminatory discharge claims, finding that Charter had reason to believe they laid sod on company time.

On appeal, the Board largely agreed with the ALJ's disposition of French's claims, though it added that the Company surveillance of the handbilling had been improper and altered the rationale for deeming the meetings with Culver and Teenier unlawful. But the Board concluded that Charter had discharged DeBeau and Schoof based on the mistaken belief that they were involved with the union. The Board deemed the sod-laying rationale pretextual for two

reasons:  the Company's "reasons for relying on Lothian's secondhand account simply do not withstand reasonable scrutiny," and offenses of this kind had not resulted in discharge in the past.  Charter petitions for review, and the General Counsel cross-petitions for enforcement.

## II. ANALYSIS

The NLRA guarantees the right of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  To ensure robust protection of these rights, the Act forbids "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  *Id.* § 158(a)(3).  The Act also makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights under § 157.  *Id.* § 158(a)(1).  An employer violates this provision "when substantial evidence demonstrates that the employer's actions, considered from the employees' point of view, had a reasonable tendency to coerce."  *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 543 (6th Cir. 2016) (brackets omitted) (quoting *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005)).  Actual coercion is unnecessary.  *See id.*

Our review of a Board decision applying these provisions "is quite limited."  *Id.* at 542 (quoting *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997)).  We review the Board's legal conclusions de novo, though we "will uphold the Board's reasonable interpretation of the [NLRA] where Congress has not spoken to the contrary on the same issue."  *Id.* (quoting *Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002)).  We review the Board's factual conclusions for substantial evidence.  "Under that deferential standard, we must uphold the NLRB's factual determinations if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if we may have reached a different conclusion had the matter been before us de novo."  *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019) (citations and internal quotation marks omitted).  And finally, we may overturn the Board's credibility determinations "'only if they overstep the bounds of reason' or 'are inherently unreasonable or self-contradictory.'"  *Id.* (quoting *Caterpillar Logistics*, 835 F.3d at 542).

**A. Pre-Discharge Allegations**

We consider Charter's alleged violations of the Act in the order they occurred, beginning with the five instances that the Board determined violated § 158(a)(1) of the Act: (1) surveillance of the July 15 union handbilling; (2) Teenier's July 16 conversation with French; (3) Culver's July 17 ride-along with French; (4) the reassignment of French and his teammates to rural areas in late July; and (5) Lothian's September 30 safety check with French.

As a preliminary matter, Charter asserts that most of these claims are barred because they were not raised in French's initial charge filed with the NLRB, which listed only French's termination and the September 30 conversation with Lothian. French added the first four events in an amended charge filed approximately a year later.

We have entertained challenges to the Board's decision to allow amendments in a handful of cases. *See, e.g.*, *Peters v. NLRB*, 153 F.3d 289, 296 (6th Cir. 1998); *Don Lee Distrib. Inc. v. NLRB*, 145 F.3d 834, 844–45 (6th Cir. 1998); *Henry Bierce Co. v. NLRB*, 23 F.3d 1101, 1108 n.1 (6th Cir. 1994); *Briggs Plumbingware, Inc. v. NLRB*, 877 F.2d 1282, 1291 (6th Cir. 1989). These cases confirm, albeit under varying formulations, that our review of this trial management matter is limited and deferential. *See Peters*, 153 F.3d at 296 (granting the Board "latitude" in "interpreting its own rules"); *Don Lee*, 145 F.3d at 845 (applying the substantial evidence standard); *Henry Bierce*, 23 F.3d at 1108 n.1 (emphasizing the Board's "broad authority" regarding amendments (citation omitted)).

Our central concern has been compliance with the Act itself, the "statutory basis" for this argument. *Peters*, 153 F.3d at 296; *see also Don Lee*, 145 F.3d at 845; *Henry Bierce*, 23 F.3d at 1108 n.1. The NLRA prohibits issuing a complaint "based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). "The intended purpose of [§ 160(b)] is that, in the absence of a properly served charge on file, a party is assured that on any given day its liability under the Act is extinguished for any activities occurring more than six months before." *Don Lee*, 145 F.3d at 844 (quoting *Chemung Contracting Corp.*, 291 N.L.R.B. 773, 774 (1988)); *see also NLRB v. Fant Milling Co.*, 360 U.S. 301, 309 n.9 (1959) ("This limitation extinguishes liability for unfair labor practices committed

more than six months prior to the filing of the charge."). That purpose is not implicated here. The earliest alleged violation occurred on July 15, and French filed his charge four months later, in November.

Another problem arises when the allegations raised against the employer change significantly during administrative proceedings, such that "the nature of the charges in the [Board's] complaint d[oes] not provide notice to the company" of the violations it must defend against. *Henry Bierce*, 23 F.3d at 1106. We expressed discomfort, for example, when a complaint was amended on the final day of the hearing. *Id.* at 1107–08 & n.1. But French's amendment was to his charge and was issued more than five months before the hearings began. As the Supreme Court has instructed, "[a] charge filed with the Labor Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry." *Fant Milling*, 360 U.S. at 307. Thus, neither the six-month limitation in the NLRA nor the timeliness of amendments to a complaint are at issue here.

Charter urges us nonetheless to scrutinize the Board's finding that the original and amended charges are "closely related" under the three-factor test laid out in *Redd-I, Inc.*, 290 N.L.R.B. 1115, 1118 (1988).[3] Assuming for purposes of argument that this test governs the validity of charge amendments, a long line of Board precedent recognizes that challenges to different aspects of an employer's "overall plan" to resist or undermine union organization are both legally and factually related—the first two *Redd-I* factors. *See, e.g.*, *SKC Elec., Inc.*, 350 N.L.R.B. 857, 858 (2007); *Carney Hosp.*, 350 N.L.R.B. 627, 630 (2007); *Well-Bred Loaf*, 303 N.L.R.B. 1016, 1016 n.1 (1991). As French frames his allegations, Charter responded to his attempts at organization with a concerted campaign against unionization in general (by surveilling the handbilling and scheduling union avoidance meetings) and against him in particular (by questioning, reassigning, threatening, and, ultimately, firing him). As is discussed below, many of these actions amounted to independent violations of the Act. Each action emanated from the same protected activity, the union handbilling that French instigated. All but

---

[3]At least one of our sister circuits has rejected the *Redd-I* test as "more rigorous" than required by the law of that court. *New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 598 n.6 (5th Cir. 2000) (quoting *Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426, 1437 n.10 (5th Cir. 1991)).

the surveillance itself targeted (at least in part) the same employee, French.  Several involved the same Charter official, Regional Director Culver.

As for the final *Redd-I* prong and Charter's submission that it does not assert identical defenses to each of French's claims, the Board has emphasized that the "closely related" analysis does not "rely on a respondent's proffered reasons where, as here, a judge has already rejected them as pretextual after hearing all the evidence." *Davis Elec. Constructors, Inc.*, 291 N.L.R.B. 115, 116, n.9 (1988).  Both the Board and the ALJ found pretext here.  And more fundamentally, the final prong of the *Redd-I* analysis does not depend on the respondent's characterization of its defenses but instead ensures fairness by asking "whether a reasonable respondent would have preserved similar evidence and prepared a similar case" prior to the amendments.  *Redd-I*, 290 N.L.R.B. at 1118.  Here, because the events added to the charge evidence Charter's anti-union animus in the period leading up to French's discharge, the events would have been at issue even under French's initial charge.  In sum, "the NLRB has shown substantial evidence" that French's old and new charges are closely related.  *Don Lee*, 145 F.3d at 845.

We now turn to the merits of French's pre-discharge claims.  In each instance, we ask whether substantial evidence supports the Board's conclusion that the challenged action, placed in context and "considered from the employees' point of view, had a reasonable tendency to coerce." *Caterpillar Logistics*, 835 F.3d at 543 (citation omitted).

### 1.  July 15 Surveillance of Handbilling

The Board found Charter unlawfully surveilled the union handbilling.  The NLRB has deemed surveillance objectionable when supervisors stood "close enough to the handbilling that they could identify not only those employees who passed by the handbillers, but even which employees took a handbill from the union organizers." *Partylite Worldwide, Inc.*, 344 N.L.R.B. 1342, 1342 (2005).  Charter's observers took comparable steps to identify employees with union sympathies, including one supervisor stopping an employee who reported to him to ask whether he had taken a flyer.

We have likewise held that, although "an employer's mere observation of open, public union activity on or near its property does not constitute unlawful surveillance, when

surveillance activity constitutes more than mere observation, the employer's conduct violates the Act." *Clock Elec. v. NLRB*, 162 F.3d 907, 918 (6th Cir. 1998) (citation and internal quotation marks omitted). Employers cross this line when they "engage in behavior that is 'out of the ordinary.'" *Partylite*, 344 N.L.R.B. at 1342 (quoting *Arrow Auto. Indus.*, 258 N.L.R.B. 860, 860 (1981)). In this case, a state-wide manager, Teenier, took the unusual steps of driving over from his office just to observe the handbilling and calling his Regional Director, Culver. Teenier may also have relayed instructions from Culver that the supervisors should note which employees took handbills—another out-of-the-ordinary behavior.

Because a reasonable employee might be dissuaded from engaging in protected activity under these circumstances, substantial evidence supports the Board's finding of an unfair labor practice.

### 2. July 16 Conversation with Teenier

Next, we turn to Teenier's visit and discussion with French the day after the handbilling. The Board determined this conversation violated the Act in four different ways. Because each potential violation is relevant to the ordered relief, we consider each in turn.

Creating an impression of surveillance violates the Act because "employees should be free to participate in union organizing campaigns without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways." *Caterpillar Logistics*, 835 F.3d at 544 (quoting *Flexsteel Indus., Inc.*, 311 N.L.R.B. 257, 257 (1993)). The Act is violated if an "employee would reasonably assume from [a management] statement that their union activities had been placed under surveillance," *id.* (quoting *Flexsteel*, 311 N.L.R.B. at 257), as, for example, "when an employer tells employees that it is aware of their union activities, but fails to tell them the source of that information." *McClain & Co.*, 358 N.L.R.B. 1070, 1073 (2012). Teenier did precisely that when, without naming his source, he informed French that his name had come up as related to union activity and that he was being "looked at closely by members of upper management." Because French's involvement in the handbilling had been a secret, he could reasonably assume that his union activities were under Charter surveillance.

Second, as with surveillance, employers may not interrogate employees in a manner that, under all the circumstances, "reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Caterpillar Logistics*, 835 F.3d at 543 (quoting *Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir. 1985)). "A finding of 'actual coercion' is not required." *Id.* (quoting *Dayton Newspapers*, 402 F.3d at 659). In assessing the coercive potential of an interrogation, the Board considers factors including "the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation." *Id.* (quoting *Dayton Typographic*, 778 F.2d at 1194). Here, Teenier went out to the field, spoke alone with French in Teenier's car, and asked about French's undisclosed involvement in union activities. We have found coercion on materially similar facts, where the employee's "union support was private," a supervisor "sought [the employee's] position on the union," and the supervisor "approached [the employee] on the work floor while [he] was alone." *Id*. And though Teenier and French appear to have enjoyed a friendly working relationship, we have deemed friendly relations "irrelevant" to the coercion calculus. *Seligman & Assocs., Inc. v. NLRB*, 639 F.2d 307, 309 (6th Cir. 1981); *see also id.* ("Section 8(a)(1) prohibits any conduct, friendly or not, which interferes with the free exercise by employees of their rights under the Act."). Substantial evidence therefore supports the Board's finding that Charter violated the Act through coercive interrogation.

Next, "employer threats of closer supervision because of union activity violate" the Act. *Paul Mueller Co.*, 332 N.L.R.B. 312, 312 (2000). The day after union handbilling, during an unscheduled one-on-one meeting, Teenier told French that if he was involved with the union, it will bring a lot of "unwanted attention" onto himself and to the team and that French was being "looked at closely by members of upper management." French could not recall the conversation verbatim, describing only its general investigative tenor. The Board credited Teenier's explicit description of his threat of closer supervision, which supports its finding of a violation of the Act.

And finally, "an employer cannot solicit grievances from employees during a union organizing campaign with the express or implied suggestion that the problems will be resolved if the union is turned away." *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007) (quoting

*NLRB v. V&S Schuler Eng'g, Inc.*, 309 F.3d 362, 370 (6th Cir. 2002)). The Board has found an implied suggestion where a supervisor "initiated a conversation with [an employee], inquired about her union sentiments, threatened adverse consequences from unionization, then encouraged [the employee] to discuss her problems with" that supervisor. *Sweet St. Desserts, Inc.*, 319 N.L.R.B. 307, 307 (1995). The context here was materially the same as that in *Sweet Street Desserts*. During an interrogation about union activity initiated by the supervisor and threatening closer supervision, Teenier told French that if there was anything he needed to discuss, he needed to bring it to Teenier's attention. In addition, the inference of impropriety is "particularly compelling" when an employer changes its practices regarding grievances "during a union organizational campaign." *Amptech, Inc.*, 342 N.L.R.B. 1131, 1137 (2004). Here, Teenier, a manager over all auditors and technicians in Michigan who is two levels above French in seniority, spontaneously visited him in the field and there suggested French bring any issues directly to Teenier. The Board's finding of improper solicitation of grievances was therefore supported by substantial evidence.

### 3. July 17 Ride-Along with Culver

The Board found that Charter violated the Act again the next day, when Regional Director Culver initiated an unscheduled ride-along with French. Just as an employer may not threaten closer supervision due to union activity, it may not follow through on that threat. Thus, an employer violates the Act "by more closely monitoring employees who had engaged in union activity." *Gold Kist, Inc.*, 341 N.L.R.B. 1040, 1040 (2004). Contrary to Charter's argument, union activity need not be "personally seen" during the close supervision; the question is whether the supervision is motivated by earlier union activity. *Id.* Here, Culver spent two hours observing French one-on-one. This observation occurred two days after union handbilling and one day after Teenier threatened French with closer supervision. No supervisor had ever gone on a ride-along with French before. In light of these suggestive facts, the Board was not required to credit Culver's explanation that "he was new to the department and wanted to learn the operation he was supervising"—just as that explanation was not credited in *Stabilus, Inc.*, 355 N.L.R.B. 836, 864 (2010); *see also id.* at 837 & n.7 (adopting the ALJ's findings regarding monitoring).

In addition, Culver reported back to senior management about the ride-along, highlighting that French "talked about things he had no reason to be involved with," such as the way technicians were evaluated.  Because French was an auditor, the technicians' complaints would presumably be of interest to him only if he had been discussing grievances with technicians—as, indeed, he had.  On this record, the Board could draw the same conclusion that French himself did:  that he was being monitored more closely because of his protected activity.

### 4. Late July Reassignment

The Board also sustained French's charge that Teenier discriminatorily reassigned French's entire group to rural areas in the weeks after the handbilling.  "It is well settled that an employer may not transfer employees for the purpose of discouraging union activity."  *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 690 (6th Cir. 2006).  For example, employers may not transfer pro-union employees to "limit[] their contact with other employees."  *Am. Red Cross Mo.-Ill. Blood Servs. Region*, 347 N.L.R.B. 347, 348 n.12 (2006).  In this case, Teenier, who ordered the reassignment, admitted unlawful motivation, saying a Company vice president told him "to isolate the employees and keep them away from other technicians, other audiences so to speak."  And although another manager, Culver, testified that he never heard that instruction, Charter did not establish that Culver was present on the call when Teenier received his impermissible instructions.  Even if he was, the decision to credit Teenier over Culver was reasonable in light of the ALJ's cogent and well-supported explanation of how Culver's testimony is "riddled with what are at best inaccuracies."

Charter points out that the transferred auditors had some post-transfer contact with other employees.  But a contact-limiting transfer is impermissible even if the employer does not "isolate [the transferred employees] from every other employee on every day of employment."  *Id.*  Charter also submits that it had a valid business reason for the transfer, as periodic audits of rural areas are necessary.  But again, the Board was entitled to credit Teenier's testimony about impermissible motivation.  And without regard to that testimony, the Board could infer pretext from French's testimony that he was reassigned before completing his in-city assignment and DeBeau's testimony that he was reassigned to an area he had already completed.  The Board's decision is supported by substantial evidence.

5. September 30 Safety Check with Lothian

Turning to the final pre-discharge allegation, the Board concluded that Lothian's conversation with French during the September 30 safety check violated the Act in two different ways. French described the relevant portion of the conversation as follows:

> [Lothian] told me that the landscape of the department was going to change. You know, being as that you're the—you know, you were outed as the union mastermind, you know, you should get on my side with this because people were going to get fired. He told me that years ago, he became supervisor by squashing a union drive . . . .

(Administrative Record at 74–75)  Charter urges that French's description of the conversation is not credible. But Lothian was not called to testify, and French's account stands uncontradicted in the record. The Board's decision to credit the only evidence before it does not overstep the bounds of reason. *See Airgas*, 916 F.3d at 560.

Turning to the substance of the violations, Lothian's unexplained "union mastermind" comment, like Teenier's July 16 statement, created an impermissible impression of surveillance. *See Caterpillar Logistics*, 835 F.3d at 544.  Once again, a Charter supervisor told French that the Company was "aware of [his] union activities, but fail[ed] to tell [him] the source of that information." *McClain & Co.*, 358 N.L.R.B. at 1073.  For the reasons described in the context of the July 16 violation, the Board could conclude that this statement created an impermissible impression of surveillance.

The Board also held that these statements amounted to an impermissible threat of discharge.  The NLRA prohibits employers from "threatening employees with reprisals.  In determining whether a statement is a coercive threat, the Board considers the total context of the situation and is justified in determining the question from the standpoint of employees over whom the employer has a measure of economic power." *Torbitt & Castleman*, 123 F.3d at 906 (citations, ellipsis, and internal quotation marks omitted).  The total context of Lothian's statement that French should "get on [Lothian's] side with this because people were going to get fired" would concern a reasonable employee.  In the months leading up to this conversation, Charter had committed numerous violations of the Act, many against French personally.  Then

Lothian, French's direct supervisor, engaged him in a lengthy, one-on-one conversation to discuss French's union involvement, Lothian's anti-union history, and upcoming firings. The Board could reasonably find that an employee hearing those statements would believe his job was in danger because of his protected union activity.

In sum, the Board's decisions finding violations of 29 U.S.C. § 128(a)(1) are all supported by substantial evidence.

**B. Discriminatory Discharge of French**

We now turn to the Board's determination that French was terminated in violation of the Act, 29 U.S.C. § 158(a)(3). We review a discriminatory discharge claim "under the burden-shifting framework articulated in *Wright Line*, 251 N.L.R.B. 1083 (1980), and adopted by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983)." *Airgas*, 916 F.3d at 560; *see also FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002).

      1. Prima Facie Case

Under the *Wright Line* rubric, the General Counsel bears the initial burden of establishing a prima facie case of discrimination. *Airgas*, 916 F.3d at 561. The prima facie case has three elements: "(1) [that] the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity; and (3) that the employer acted as it did on the basis of anti-union animus." *Id.* (quoting *FiveCAP*, 294 F.3d at 777). Charter concedes that the first two elements are satisfied here. French reached out to union organizers, made pro-union flyers, and suggested the organizers distribute them. And though his protected activity was private, Charter concluded that French was involved within a day.

Turning to the third element, anti-union animus, we examine the record for either circumstantial or direct evidence on point. *Id.* Circumstantial evidence inviting an inference of animus includes, among other examples, "the company's expressed hostility towards unionization combined with knowledge of the employees' union activities" and "proximity in time between the employees' union activities and their discharge." *FiveCAP*, 294 F.3d at 778 (quoting *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995)). Both are present here.

French was terminated three months after his protected activity, a temporal proximity that alone may raise concerns. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (concluding, in the context of a Title VII retaliation claim, that the three-month proximity between filing a charge and termination sufficed to infer a retaliatory motive); *see also Dish Network, LLC*, 363 N.L.R.B. No. 141, 2016 N.L.R.B. LEXIS 172, at *49 (Mar. 3, 2016). That three-month period included numerous Company violations of the Act. As discussed above, French was interrogated, threatened, and reassigned, all because of his protected activity. One of the supervisors involved in those violations, Regional Director Culver, was also involved in the decision to terminate French. And perhaps most tellingly, just two weeks before French was discharged, his immediate supervisor threatened that French, as the "union mastermind," would be discharged. "[W]here an employer's representatives have announced an intent to discharge or otherwise retaliate against an employee for engaging in protected activity, the Board has before it especially persuasive evidence that a subsequent discharge of the employee is unlawfully motivated." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 297 (6th Cir. 1985) (per curiam). This record amply demonstrates anti-union animus.

### 2. Nondiscriminatory Reasons

Under *Wright Line*, the burden next "shifts to [Charter] 'to prove that it would have made the same employment decision regardless of [French's] protected activity." *Airgas*, 916 F.3d at 565 (quoting *Ctr. Constr.*, 482 F.3d at 435). Charter offers two nondiscriminatory reasons for French's discharge: first, that French lied to Peters about Lothian telling him "everything" about the investigation, and second, that French lied to Peters about Lothian having a gun at work. If these justifications are "determined to be pretextual, the Board need not consider [them]." *Id.* And, in light of our deferential standard of review, "[s]imply showing that the evidence supports an alternative story is not enough. [Charter] must show that the Board's story is unreasonable." *NLRB v. Galicks, Inc.*, 671 F.3d 602, 608 (6th Cir. 2012).

In evaluating Charter's two rationales, the dispositive question is not whether French "committed the alleged offense." *NLRB v. Consol. Biscuit Co.*, 301 F. App'x 411, 432 (6th Cir. 2008) (quoting *McKesson Drug Co.*, 337 N.L.R.B. 935, 937 n.7 (2002)). Rather, Charter "must show that it had a *reasonable belief* that [French] committed the offense, and that it acted on that

belief when it discharged him." *Id.* at 432–33 (quoting *McKesson*, 337 N.L.R.B. at 937 n.7). Charter may not, however, rest on an argument that a senior decisionmaker had a reasonable belief if "one of [the Company's] supervisors was a primary actor in the fabrication leading to the discharge." *JMC Transp., Inc. v. NLRB*, 776 F.2d 612, 619 n.6 (6th Cir. 1985). Because Charter has consistently maintained that the discharge decision rested on the facts laid out in Peters's investigative report, our analysis focuses on the contents of and omissions from that report.

We begin with the first rationale, that French lied about Lothian discussing the investigation. Charter's invocation of this justification has been inconsistent over time. When Peters initially told French he was fired, she handed French a termination form that contained two phrases, with no detail: "Violation of Charter's Code of Conduct" and "Violation of Charter's Employee Handbook." When French responded that the handbook is long and asked for specifics, Peters refused. During the administrative proceedings, the ALJ asked Peters why she concluded French was dishonest; Peters cited only the gun comment. In its briefing before the ALJ, Charter did not discuss its belief that French was lying about Lothian having violated Peters's confidentiality instruction. Because Charter's "asserted justification is shifting and unreliable, its case is weakened, and the conclusion that the true reason [that French was discharged] was for union activity is correspondingly strengthened." *Airgas*, 916 F.3d at 566 (quoting *Healthcare Emps. Union, Local 399 v. NLRB*, 463 F.3d 909, 922 (9th Cir. 2006)).

Moreover, Peters's report reflects that French knew about Lothian's fear of being fired, the concerns about Teenier's favoritism, and Felker's purported pictures of DeBeau and Schoof laying sod on company time. The simplest explanation for how French knew this information is the one French gave that day and Schoof gave the night before: Lothian talked. Indeed, another employee told Peters that Lothian had started to discuss the investigation with him before that employee told Lothian that they should not discuss it further. A third employee described a lengthy conversation he had with Lothian about one of the special projects that was the subject of the investigation. And yet Peters testified that she credited Lothian's version of events simply because "he was always very honest, even if he knew he might get into trouble." Her report belies that assertion. When Peters asked Lothian if he had spoken to French during the week of

the safety check, Lothian denied it; then, a week later, he reversed course and said they had spoken, but not about the investigation.

In sum, the report Charter relied on caught Lothian in a lie and substantially corroborated French's version of events. Charter has therefore failed to demonstrate that the Board's finding of pretext is unreasonable. *Galicks*, 671 F.3d at 608.

Next, Charter asserts that it fired French because he lied about Lothian bringing guns to work. As Peters testified, bringing a gun to work is a serious violation of company policy. Charter's employee handbook strictly prohibits guns at the workplace, warning that "immediate termination" will result if employees have weapons "on their person, in their personal vehicle, or in a Company vehicle at any time while on property owned or leased by Charter, or while conducting Charter business, regardless of the location." For example, Teenier remembered one employee who was issued a final warning for keeping a gun in his van. And yet, after hearing this serious allegation, Peters did nothing to investigate except ask Lothian if he had a gun at work that week and, more than a week later, review Lothian's disciplinary file—which revealed past discipline for bringing a gun to work. Peters did not ask Lothian if he had brought a gun to work on other occasions, instead limiting her inquiries to the week of the safety check. On that basis, she (and, ultimately, Charter) concluded that French, not Lothian, was lying.

Because an employer's "failure to conduct a meaningful investigation" into allegations leading to discharge may give rise to an inference that anti-union sentiment was the true cause of the employer's actions, *Airgas*, 916 F.3d at 563 (quoting *Bantek West, Inc.*, 344 N.L.R.B. 886, 895 (2005)), we consider whether Peters's limited investigation was "meaningful." Even though Peters spent the days after French's accusation interviewing employees who worked closely with Lothian, her report does not reference a single question about whether Lothian had guns at work. The director of human resources confirmed that no one questioned other employees about the allegation or checked Lothian's office or vehicle for guns. Peters simply concluded that, because of the date mismatch between French's allegation and Lothian's discipline, French was dishonest. When the ALJ asked Peters the obvious follow-up question—"what about the possibility that [French] saw a gun on another occasion other than the one for which Mr. Lothian was disciplined . . .?"—Peters could say only that she would not have concluded that Lothian

brought guns on company property any other time because she "believed [Lothian] was honest and truthful." As discussed above, the record shows that this faith in Lothian's honesty was not warranted.

If the Company had asked the follow-up questions that would be expected in a meaningful investigation, it likely would have uncovered helpful information regarding the honesty of those involved. For example, Peters interviewed one of French's teammates, Kent Payne, the afternoon after she spoke to French. When Payne was asked about Lothian's guns during the administrative hearing, he testified that he had seen a rifle in Lothian's office and the outline of a derringer in his pocket. Felker, who Peters re-interviewed a few days later, subsequently testified about Lothian bringing ammunition to work and going gun shopping on company time. Schoof too could have told Peters about the time Lothian had a derringer in his company truck.

At issue is Charter's decision to discharge French for dishonesty without meaningfully investigating the issue upon which the discharge rested. *See Airgas*, 916 F.3d at 563. The critical point is that, if Charter *had* investigated, it could have either corroborated French's accusation with information from Payne, Felker, and Schoof or determined, as the ALJ later did, that French's statements about Lothian and guns were "somewhat confusing and/or contradictory." But Charter failed to conduct even a rudimentary investigation on the stated basis for French's discharge. Therefore, the Board could conclude that Charter did not *reasonably* believe, *see Consol. Biscuit Co.*, 301 F. App'x at 432–33, that the report proved French was lying. The finding of pretext is supported by substantial evidence.

## C. Discriminatory Discharge of DeBeau and Schoof

Charter next challenges the Board's determination that DeBeau and Schoof were also discharged in violation of the Act. As with French's discriminatory discharge claim, we apply the *Wright Line* burden-shifting test.

1. Prima Facie Case

DeBeau and Schoof, unlike French, were not involved in the union handbilling. But the Board has recognized for decades that it is "immaterial that the employee was not *in fact* engaging in union activity as long as that was the employer's perception and the employer was motivated to act based on that perception." *Dayton Hudson Dep't Store Co.*, 324 N.L.R.B. 33, 35 (1997); *see also NLRB v. Link-Belt Co.*, 311 U.S. 584, 589–90 (1941) (finding a violation of the Act when a supervisor mistakenly believed an employee was involved with the union and discharged him "because of his alleged union activities"). This is the logical corollary to the proposition, discussed above, that an employer may discharge an employee based on a reasonable, but mistaken, belief that the employee engaged in misconduct. In both circumstances, the employer's liability turns on its intentions.

We therefore look to evidence of Charter's perceptions about DeBeau and Schoof. In the immediate aftermath of the handbilling, both names came up in management discussions. During the same call in which Teenier reported that he had told French and a technician that their "names were brought up," only one other employee's name is listed on the page: Schoof. And although the note reads that Schoof loves Charter, singling him out is itself significant—especially because Culver originally intended to go on a ride-along with Schoof the same day as his unlawful ride-along with French. And around the same time Teenier was asking French about his union sympathies, Teenier also asked DeBeau how he felt about the union and urged him to steer clear of it.

Then, a senior vice president told Teenier that "it seemed a little funny" that everything seems to be coming out of one team (the "team" appears to have consisted of everyone reporting to Felker—including French, DeBeau, and Schoof). French, DeBeau, and Schoof, along with the one remaining Saginaw auditor, were all reassigned to rural locations. As discussed above, French's reassignment violated the Act. Lumping DeBeau and Schoof in with French raises an inference that they, too, were being punished for perceived pro-union activity. That inference is supported by Teenier's statement to DeBeau that the isolation was necessary because "there was a lot of attention on us from upper management because of union activity" and because DeBeau's name had come up. Finally, in early September, Felker and Teenier agreed to reassign

all three auditors—French, DeBeau, and Schoof—to Lothian so that the union spotlight was off of Felker's team.

Turning to the question of anti-union animus, the Board emphasized that, like French, DeBeau and Schoof were discriminatorily reassigned in violation of the Act. In addition, Charter's "contemporaneous unfair labor practices clearly support a finding of animus." *Bates Paving & Sealing, Inc.*, 364 N.L.R.B. No. 46, 2016 WL 3853833, at *4 (July 14, 2016); *see also Contemporary Cars, Inc. v. NLRB*, 814 F.3d 859, 876 (7th Cir. 2016); *NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1036 (10th Cir. 2003); *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1048 (4th Cir. 1997). In addition to the coercive tactics employed during the months between the handbilling and the discharges, French was discriminatorily discharged on the very same day that DeBeau and Schoof were discharged. A reasonable mind could conclude from this evidence that the General Counsel made out a prima facie case of discriminatory discharge. *See Airgas*, 916 F.3d at 560.

2. Nondiscriminatory Reason

Moving to the second stage of the *Wright Line* analysis, Charter submits that it would have fired DeBeau and Schoof regardless of their perceived union activity because they performed non-company work on company time and then lied to Peters about what they had done.

The Board deemed this reason pretextual in part because other employees who committed similar offenses in the past were not discharged. Disparate disciplinary decisions may establish pretext. *See, e.g.*, *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 781 (9th Cir. 2017) ("Such disparate treatment is enough to establish pretext."); *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 223 (D.C. Cir. 2016) (finding pretext where the company's discharge decision was "inconsistent with" other disciplinary decisions and "deviated from the Company's progressive disciplinary policy"); *Bates Paving*, 2016 WL 3853833, at *5 (finding pretext because "[t]he discharge was both a departure from established disciplinary practice and disparate treatment").

Charter addresses the Board's finding of disparate treatment only in two short paragraphs of its reply brief, without citation to caselaw or record evidence. This suggests that consideration of the disparate treatment finding is forfeited. *See Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 307 (6th Cir. 2010) ("[I]t is a settled appellate rule that a party forfeits issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (brackets and citation omitted)); *United States v. Carson*, 560 F.3d 566, 587 (6th Cir. 2009) ("The appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief." (brackets and citation omitted)).

Even if the issue is not forfeited, the record is replete with employees who were not fired despite misusing working hours in a manner similar to, or more serious than, DeBeau and Schoof. For example, Teenier testified that an employee who frequently returned home several hours before he clocked out was not terminated. Among Charter's disciplinary reports for violations related to timekeeping and attendance, most resulted in a verbal warning. The rare instances that resulted in written warnings followed many informal coachings and verbal warnings. For example, one employee slept on the job and failed to arrive at his first worksite on time. He received a written warning even though he had received three coachings about attendance and performance in the preceding two months; in his 13 years of employment with Charter, he had received three coachings, five verbal warnings, five written warnings, and one final warning. Four months later, when that same employee failed to use company time appropriately while on the job, he received a final warning.

Violations related to dishonesty similarly failed to result in termination. For example, falsifying documents about work that had been completed led to a verbal warning or, when preceded by many coachings, a written warning. Intentionally providing false information to a supervisor and being dishonest about his actions when questioned resulted in a final warning—even though it followed a verbal warning for falsifying documents from the month before. In essence, the records make clear that Charter generally adheres to its progressive disciplinary policy in cases involving both misuse of company time and dishonesty.

And yet, even though DeBeau and Schoof had no prior disciplinary history, Charter terminated them both. Charter's bare allegation that DeBeau and Schoof's situation might be

different than other instances of dishonesty, does not render the Board's finding of disparate treatment—and so of pretext—unreasonable. Because substantial evidence supports this conclusion, we do not reach the Board's alternate conclusion that Charter did not reasonably believe that DeBeau and Schoof performed non-company work on company time.

## III. CONCLUSION

For the foregoing reasons, we **DENY** Charter's petition for review and **GRANT** the General Counsel's cross-petition for enforcement.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

NALBANDIAN, Circuit Judge, concurring in part and concurring in the judgment. I concur in the majority's opinion and write separately on one issue: Charter's surveillance of the union handbilling on July 15, 2014. Although I agree with the majority that there is substantial evidence supporting the Board's conclusion that Charter violated 29 U.S.C. § 158(a)(1), I write separately to discuss the distinction between lawful observation and unlawful surveillance of union activity—and to explain why only *some* of the challenged conduct amounted to unlawful surveillance.

As the majority notes, supervisors may lawfully observe union activity "on or near [company] property," without violating § 158(a)(1). *Clock Elec., Inc. v. N.L.R.B.*, 162 F.3d 907, 918 (6th Cir. 1998). But the majority also cites a Board decision finding that an employer had engaged in unlawful surveillance when its supervisors stood "close enough to the handbilling that they could identify not only those employees who passed by the handbillers, but even which employees took a handbill from the union organizers." *PartyLite Worldwide, Inc.*, 344 N.L.R.B. 1342, 1342 (2005). This leaves supervisors seeking to observe union activity for lawful purposes (*e.g.*, preventing trespass on company property or ensuring safe egress for employees) in a bind. If those two rules are compatible, it would suggest that a supervisor may observe union activity—but only if he stands so far away that he cannot identify any employees who happen to pass by. At that point, the rule might as well prohibit all observation of union activity, no matter how far away the supervisor stands. But other Board decisions tell us that cannot be the case. In fact, the Board has remarked that "even an employer's close, as opposed to casual, observation of union activity at or near his premises in order to preclude trespass cannot be found to constitute unlawful surveillance of that activity." *Brown Transp. Corp.*, 294 N.L.R.B. 969, 971 (1989); *see also Aladdin Gaming, LLC*, 345 N.L.R.B. 585, 585–86 (2005); *Emenee Accessories, Inc.*, 267 N.L.R.B. 1344, 1344 (1983); *Porta Sys. Corp.*, 238 N.L.R.B. 192, 192 (1978).

So how do we draw the line between lawful observation and unlawful surveillance—and how can employers be sure not to cross it? The majority points to a line of Board decisions

explaining that an employer violates § 158(a)(1) by engaging "in behavior that is 'out of the ordinary.'" *Partylite*, 344 N.L.R.B. at 1342 (quoting *Arrow Auto. Indus.*, 258 N.L.R.B. 860, 860 (1981)). But that test is not the most reliable way to determine whether an employer has engaged in unlawful surveillance. For one, the union activity itself may be unusual, meaning that any otherwise lawful response on the part of the employer would be out of the ordinary, too. But the NLRA makes it an unlawful labor practice to "interfere with, restrain, or coerce employees in the exercise of" their rights under the Act. 29 U.S.C. § 158(a)(1). Just because an action is unusual (*e.g.*, supervisor stands in company parking lot to ensure nearby union representatives do not trespass) does not *necessarily* imply that it is coercive.

Several federal appellate courts have cautioned against the "out of the ordinary test" to distinguish lawful observation from unlawful surveillance. The Fourth Circuit, for example, explained that the NLRA "requires more than mere 'out-of-the-ordinary' conduct in an area where employees can be seen; the Act requires conduct that could have reasonably been construed in the totality of the circumstances as coercive, intimidating, or threatening in nature." *Intertape Polymer Corp. v. N.L.R.B.*, 801 F.3d 224, 239 (4th Cir. 2015). And the Eighth Circuit noted that some of the Board's more recent decisions overlook the fact that § 158(a)(1) prohibits coercion, not simply behavior that is unusual or out of the ordinary. *Greater Omaha Packing Co., Inc. v. N.L.R.B.*, 790 F.3d 816, 823 (8th Cir. 2015). As the Eighth Circuit explained, an employer has the right to "non-coercively gather information, even about union activities." *Id.* So "absent a tendency to coerce, surveillance or creating the impression of surveillance does not constitute a [§ 158(a)(1)] violation." *Id.* (quoting *Belcher Towing Co. v. N.L.R.B.*, 726 F.2d 705, 708 (11th Cir. 1984)).

Instead of merely asking whether the challenged conduct was unusual, we must determine whether the employer's observation, "considered from the employees' point of view, had a reasonable tendency to coerce." *Caterpillar Logistics, Inc. v. N.L.R.B.*, 835 F.3d at 536, 543 (6th Cir. 2016) (quoting *Dayton Newspapers, Inc. v. N.L.R.B.*, 402 F.3d 651, 659 (6th Cir. 2005)). Several factors help guide that inquiry, including the duration of the observation, the distance between the observing employer and the union activity, whether the employer engaged in other coercive or intimidating behavior during the observation, and whether the employer had

a legitimate reason for observing the activity. *Intertape*, 801 F.3d at 236; *see also Aladdin Gaming, LLC*, 345 N.L.R.B. at 585 (whether supervisors unlawfully surveilled employees "depends on the nature and duration of their observation").

Using those factors as a guide, I disagree with the Board's conclusion (which the majority upholds) that Charter supervisor T.J. Teenier engaged in unlawful surveillance of the union handbilling. Teenier testified that he spent about fifteen to twenty minutes observing the union activity. (Administrative Record at 387–88.) But a prior Board decision found that a Wal-Mart supervisor did not violate § 158(a)(1) when the supervisor "sat on a bench outside the store entrance for about 30 minutes, watching the organizers distribute handbills." *Wal-Mart Stores, Inc.*, 340 N.L.R.B. 1216, 1217 (2003). That Teenier spent about half that time observing the union activity weighs against finding a violation of § 158(a)(1).

There is no record evidence about how close Teenier came to the union handbillers and no evidence that he was so close to the handbillers that his presence was physically intimidating. Nor is there evidence that Teenier engaged in other behavior that courts and the Board have found to be coercive, such as photographing employees interacting with the union representatives, (*see, e.g.*, *Clock Elec.,* 162 F.3d at 917–18), verbally harassing employees who took union literature (*see, e.g.*, *Arrow Auto. Indus.*, 258 N.L.R.B. at 863), or giving the impression—whether accurate or not—that he was recording which employees were engaging with the union representatives (*see, e.g.*, *Eddyleon Chocolate Co.*, 301 N.L.R.B. 887, 888 (1991)).

One additional factor to consider is whether Teenier had a legitimate reason for being in Saginaw. At the time of the handbilling, Teenier managed Charter's plant security for the state of Michigan. Given this role, Teenier would not have seemed out of place, even though he drove fifteen minutes from his home office in Bay City. To be sure, several Board decisions have found a violation of § 158(a)(1) when a supervisor traveled to observe union activity, but those decisions do not align with this case. In *Sprain Brook Manor Nursing Home LLC*, the Board found a violation when a nursing-home administrator traveled to work early in the morning on a Saturday—her day off—because she thought there might be union activity at the nursing home. 351 N.L.R.B. 1190, 1191 (2007). The administrator stood at the entryway nearest to where the

union organizers were meeting for two hours, simply to make her presence known. *Id.* There was no evidence that the administrator held any kind of security role, nor was there any other legitimate explanation for her presence on her day off.

The Fourth Circuit also enforced an NLRB order finding that several supervisors engaged in unlawful surveillance when they traveled to a local high school, thinking that their employees were participating in a union meeting there. *N.L.R.B. v. Nueva Eng'g, Inc.*, 761 F.2d 961, 967 (4th Cir. 1985). The supervisors arrived at the high school to find that the meeting had been canceled, but they happened to spot three employees driving on an adjacent road and followed them to a nearby home. *Id.* But here, of course, Teenier observed the union handbillers from Charter's parking lot, not an offsite location.

Applying all of the *Intertape* factors to these facts suggests that Teenier's observation did not violate § 158(a)(1). But even if we were to set aside those factors and rely exclusively on the Board's "out of the ordinary" test to distinguish lawful observation from unlawful surveillance, there is no evidence that Teenier's presence in Saginaw was unusual. The Board simply infers that Teenier's "presence was out of the ordinary" because Teenier drove fifteen minutes from his home office in Bay City to Charter's facility in Saginaw to observe the union activity. Nothing in the record, however, establishes that Teenier rarely visited Saginaw. To the contrary, we know that Teenier managed Charter supervisors (including Shawn Felker) based in Saginaw— and that Teenier oversaw Charter's plant security for the state of Michigan. For all we know, Teenier could have made the fifteen-minute drive to Saginaw each morning, as he did on July 15 to observe the union activity. The record, however, is silent as to how often Teenier visited the Saginaw plant. In sum, there is insufficient evidence to support the Board's conclusion that Teenier's presence violated the NLRA.

If Teenier's presence in Saginaw cannot support the Board's conclusion that Charter violated § 158(a)(1), that leaves another potential violation: the conversation between Charter supervisor Shawn Felker and technician Kent Payne on the morning of July 15. Payne testified that after he passed the union representatives and entered Charter's parking lot, Felker approached him and asked whether he had taken a pro-union flyer. According to Payne, Felker "just let me know that the Union was there, and he asked me if I took a flyer." (Administrative

Record at 1330.)  Payne testified that Felker said nothing else about the union and that he did not feel reluctant to tell Felker the truth, even if he had taken a flyer.[1]  The Board concluded—and the majority agrees—that Felker's question violated § 158(a)(1).

I agree with the majority that substantial evidence supports the Board's conclusion and write separately only to underscore that mere "[q]uestioning or interrogation of employees by the employer is not *per se* unlawful." *N.L.R.B. v. Homemaker Shops, Inc.*, 724 F.2d 535, 548 (6th Cir. 1984) (citing *N.L.R.B. v. Dale Indus.*, 355 F.2d 851, 852–53 (6th Cir. 1966)).  *Homemaker Shops* makes clear that "[i]nfrequent, isolated and innocuous inquiries of a relatively small number of employees, standing alone, do not constitute interference, restraint or coercion within the meaning of section 8(a)(1) of the Act." *Id.* at 548–49 (quoting *N.L.R.B. v. Elias Bros. Big Boy, Inc.*, 325 F.2d 360, 364 (6th Cir. 1963)); *see also N.L.R.B. v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 108 (6th Cir. 1987).  So when an employee alleges unlawful interrogation, *Homemaker Shops* instructs us to consider "all the surrounding circumstances" and ask whether that interrogation "reasonably tended to interfere with the free exercise of employee rights." *Homemaker Shops*, 724 F.2d at 548 (citations omitted).

Felker's question, by itself, seems benign.  Payne testified that Felker asked no other questions about the union, nor did Felker threaten Payne with repercussions if he engaged with the union.  But the "surrounding circumstances" cast Felker's question in a different light.  Felker stood guard in Charter's parking lot for 90 minutes, about three times as long as Teenier.  Felker also testified that Charter supervisor Chad Erskine told him to "make a mental note" of anyone who had taken a flyer—and to notify Charter's human resources department about those employees.  (Administrative Record at 868.)  Felker, it seems, was not simply in the parking lot to observe the union activity for security purposes.

So although a standalone, non-threatening question about participation in union activity is not a *per se* violation of the NLRA, there is enough evidence here to conclude that Felker's question was not one of pure curiosity and that it violated the NLRA.

---

[1]To be clear, whether the employer's questioning or interrogation violated the NLRA is an objective inquiry.  *See, e.g.*, *Wyman-Gordon Co. v. N.L.R.B.*, 654 F.2d 134, 145 (1st Cir. 1981); *Frito-Lay, Inc. v. N.L.R.B.*, 585 F.2d 62, 65 (3d Cir. 1978).