RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RIETH-RILEY CONSTRUCTION CO., INC.,

        *Petitioner/Cross-Respondent*,

    *v.*

NATIONAL LABOR RELATIONS BOARD,

        *Respondent/Cross-Petitioner*,

LOCAL 324, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO,

        *Intervenor (24-2123)*.

Nos. 24-2123/25-1082

─────────────────

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
Nos. 07-CA-234085; 07-CB-226531.

Argued:  February 26, 2026

Decided and Filed:  April 8, 2026

Before:  MOORE, COLE, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Brian J. Paul, FAEGRE DRINKER BIDDLE & REATH LLP, Indianapolis, Indiana, for Rieth-Riley.  Eric Weitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the NLRB.  Amy E. Bachelder, LOCAL 324, IUOE, AFL-CIO, Bloomfield Township, Michigan, for Intervenor.  **ON BRIEF:**  Brian J. Paul, Stuart R. Buttrick, Ryan J. Funk, Alexander E. Preller, FAEGRE DRINKER BIDDLE & REATH LLP, Indianapolis, Indiana, for Rieth-Riley.  Eric Weitz, Ruth E. Burdick, Amy Ginn, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the NLRB.  Amy E. Bachelder, LOCAL 324, IUOE, AFL-CIO, Bloomfield Township, Michigan, for Intervenor.

_____

**OPINION**

_____

MATHIS, Circuit Judge.   Rieth-Riley Construction Company and the union representative for some of its workers have been in a nearly decade-long conflict.  The dispute began in 2018 when Local 324, International Union of Operating Engineers, AFL-CIO (the "Union"), sought to withdraw from a multiemployer bargaining arrangement so that it could negotiate individually with Rieth-Riley and the other employers.  But what should have been typical collective-bargaining negotiations turned into several alleged unfair labor practices, a weeks-long employee lockout, and a strike that continues to this day.

The National Labor Relations Board issued a decision ordering Rieth-Riley to bargain in good faith with the Union after finding that Rieth-Riley committed various unfair labor practices throughout the dispute.  Rieth-Riley now challenges the Board's decision, and the Board asks us to enforce it.  For the reasons below, we deny Rieth-Riley's petition for review and enforce the Board's order.

**I.**

Rieth-Riley is an Indiana-based construction contractor that performs asphalt paving and other highway-and-road-construction work in Michigan.  The company employs around 130 to 170 operating engineers in Michigan who have been represented by the Union since at least 1993.  Historically, the Union had bargained with Rieth-Riley as part of a multiemployer group with other road-construction contractors.  This multiemployer bargaining was done through an employer association, the Michigan Infrastructure and Transportation Association ("MITA").

**A.**

We begin in early 2018.  At that time, the Union and MITA were parties to a collective-bargaining agreement (the "Road Agreement"), which was set to expire on June 1, 2018.  The parties understood that the Road Agreement, as a multiemployer bargaining agreement, prohibited the Union from bargaining individually with any of MITA's member companies.

Pertinent here, the Road Agreement included a contract-modification deadline requiring that any party wishing to terminate or modify the agreement provide 60 days' notice before the contract's expiration date. That deadline was April 2, 2018. If a party failed to provide notice of its intent to modify or terminate the contract by this date, the contract would "continue in force from year to year." A.R. 2779.

On February 19, 2018, MITA executive vice president Michael Nystrom sent a letter to Union business agent Douglas Stockwell stating that MITA, on behalf of Rieth-Riley and its other member employers, wished to terminate the Road Agreement. This meant that the Road Agreement would expire on June 1, 2018. Along with terminating the current contract, Nystrom's letter included "reopener" language requesting dates for the parties to begin negotiating a new collective-bargaining agreement. He hoped to "reach[] a new contract prior to the termination date [of the Road Agreement]." *Id.* at 2787.

A few days later, Stockwell responded. He mailed the individual contractor companies directly, including Rieth-Riley, stating that the Union also wished to terminate the Road Agreement. The Union's missive did not state a reciprocal desire to begin negotiating a new multiemployer contract. But rather than sending a termination notice with identical language to MITA, the Union mistakenly sent a letter with "reopener" language: "The Union hereby offers to meet and confer for the purpose of negotiating a new contract." *Id.* at 2793.

In March, Nystrom asked Stockwell when successor-contract negotiations would begin between the Union and MITA. Stockwell suggested that Nystrom provide him with MITA's availability. Nystrom then sent a follow-up email on April 11 proposing dates for the parties "to begin discussions." *Id.* at 3289. But Stockwell never responded.

On April 26, Stockwell realized that the Union sent a reopener letter (rather than a mere termination letter) to MITA. So on May 2, the Union sent a letter to MITA acknowledging Nystrom's previous termination of the Road Agreement and noted that it would be withdrawing from multiemployer bargaining. A MITA representative found the Union's decision disappointing because, before the May 2 letter, MITA "thought that we were going to negotiate like we always do." *Id.* at 1035.

Undeterred, MITA urged the Union to reconsider so they could "initiate negotiations." *Id.* at 3301. The Union held firm. At a general membership meeting in June, Stockwell explained that the Union did not want a multiemployer contract and that it instead wanted to negotiate individual contracts with each employer. He also warned that a strike might be necessary to reach this goal. In agreement, the Union's members voted overwhelmingly in favor of granting the Union general strike authority.

An issue soon arose between the Union and Rieth-Riley. The Union's Fringe Benefit Fund Office ran into issues crediting certain employee benefits contributions from MITA members, including Rieth-Riley. The problem began after the Road Agreement expired when Rieth-Riley stopped deducting fund contributions from its employees' paychecks. This was, according to the Union, "the equivalent of an immediate 15% pay increase" for bargaining-unit employees. D. 31 at p.20. Rieth-Riley also announced that "[d]ue to the inconvenience to employees[] created by Local 324, the company [would] proceed with an economic [wage] increase" of $2 per hour. A.R. 2821. It even implemented the raise retroactively to "cover[] the time period from the beginning of June up to the current pay period." *Id.* (emphasis omitted). Rieth-Riley did not provide the Union with notice of these changes or the opportunity to bargain over the pay increase.

Tensions escalated later that summer. Near the end of August, the Union conducted an informational picketing session at Ajax, another company represented by MITA. MITA, perceiving this conduct as a "strike action," responded by notifying the Union that it would initiate a lockout on September 4 if the Union continued to resist bargaining on a multiemployer basis. *Id.* at 2839. MITA emphasized that the lockout would continue until "the union ratifies [another] statewide road agreement with MITA on the terms set forth [by MITA]." *Id.* The Union responded promptly, declaring that it was not "required to engage in any bargaining on a multi-employer basis." *Id.* at 2886.

So, on September 4, the lockout began. It lasted over three weeks. The lockout ended only when Michigan Governor Rick Snyder intervened. With his assistance, the parties agreed that once the construction season ended for the winter they would begin mediation to negotiate a successor contract—this time on an individual-employer basis.

**B.**

In October 2018, another conflict erupted.  Recall that Rieth-Riley stopped deducting contributions from its employees' paychecks soon after the Road Agreement expired on June 1, 2018.  At that time, the company believed that it maintained a § 8(f) bargaining relationship with the Union, which would have meant Rieth-Riley had no duty to bargain with the Union after the Road Agreement expired.  *See* 29 U.S.C. § 158(f).  But by August 2018, Rieth-Riley had confirmed that the parties had a § 9(a) bargaining relationship instead.  This meant that the company (1) accepted the Union as the sole collective-bargaining representative for its Michigan operating engineers, and (2) had a duty to bargain in good faith with the Union even after the Road Agreement expired.  Counsel for the Union's fringe-benefit funds confirmed this in October and recommended accepting Rieth-Riley's contributions toward its employees' benefits funds.  Rieth-Riley no longer held these funds, however, because it had paid the contributions directly to its employees.  The company then notified the Union that it would resume making fund contributions and that it needed to "claw back" money from its employees to make the benefits funds whole.  A.R. 4622.

The Union pushed back.  It responded that the clawback was unlawful and requested that the company wait until the start of negotiations to resolve Rieth-Riley's concern.  But Rieth-Riley remained firm.  The company notified its employees that it would begin clawing back the funds from their paychecks later that month.

Meanwhile, Rieth-Riley and the Union began bargaining for a successor contract in November 2018.  But in spring 2019, things changed abruptly.

On May 29, 2019, the NLRB's General Counsel filed an unfair-labor-practice complaint against Rieth-Riley.  It alleged that the company had violated the National Labor Relations Act by, among other things, insisting on multiemployer bargaining and locking out the bargaining-unit employees.  The General Counsel offered to settle the case if Rieth-Riley paid $1.8 million, which would replace the income employees lost during the lockout.  Rieth-Riley rejected this offer.

On July 25, Union representatives met with Rieth-Riley employees and prepared them for a possible strike. As employees entered the meeting, they received copies of the May 29 unfair-labor-practice complaint. And after Stockwell provided employees with an update on contract negotiations, Union president Ken Dombrow discussed the complaint and Rieth-Riley's rejection of the Board's settlement offer. Dombrow later testified that his goal for the meeting was to highlight the complaint's allegations and the rejected settlement offer. During the meeting, employees asked questions about the status of the unfair-labor-practice allegations, when the litigation would be resolved, and how they could receive certain unemployment benefits from the earlier lockout period. Union leaders, listening to these concerns, reassured the employees that the Union backed them completely.

Then, on July 30, Stockwell authorized a strike based on the membership's June 2018 vote granting strike authority. During the strike, employees picketed Rieth-Riley jobsites with signs referencing the company's "Unfair Labor Practices." And from the onset of the strike the Union consistently stated that workers were protesting Rieth-Riley's rejection of the Board's $1.8 million settlement offer to compensate employees due to the nearly month-long lockout.

As contract negotiations for a successor contract continued amid the ongoing strike, another issue arose. On June 1, 2020, Rieth-Riley announced a $1 per hour raise, which would affect the bargaining-unit employees. And like before, the company implemented the wage increase without notifying the Union or providing it with an opportunity to bargain. The Board amended its unfair-labor-practice complaint to include the 2020 wage increase.

**C.**

In January 2022, after a hearing, an administrative law judge issued his decision. The ALJ made four rulings relevant to this appeal. First, the ALJ found that the Union's withdrawal from multiemployer bargaining was timely and therefore lawful. Second, he determined that Rieth-Riley violated the NLRA by locking out Union members to pressure the Union to bargain on a multiemployer basis. Third, he determined that Rieth-Riley violated the NLRA by unilaterally granting employees wage increases in 2018 and 2020 and by making certain deductions from their paychecks. Fourth, he found that the 2019 strike was an economic strike,

not an unfair-labor-practice strike, because insufficient evidence connected the strike to Rieth-Riley's unfair labor practices.

Rieth-Riley appealed the ALJ's decision to the Board. The Board affirmed in part and reversed in part. It reversed the ALJ's conclusion that the 2019 strike was an economic strike, finding the strike was based partly on Rieth-Riley's unfair labor practices. It otherwise affirmed the ALJ's decision, ruling against Rieth-Riley on all claims. As a remedy, the Board imposed an affirmative bargaining order requiring Rieth-Riley to bargain in good faith and prohibiting any attempt at decertifying the Union for as long as "reasonably necessary." *Id.* at 5385.

Rieth-Riley petitions for review of the Board's order. The Board cross petitions to enforce its order.

## II.

The Board's decisions are "subject to limited judicial review." *Beth Isr. Hosp. v. NLRB*, 437 U.S. 483, 501 (1978) (quotation omitted). We review de novo the Board's legal conclusions, including the Board's interpretation of the NLRA. *NLRB v. Starbucks Corp.*, 159 F.4th 455, 468 (6th Cir. 2025).

We review the Board's factual findings, and its application of law to the facts, for substantial evidence. 29 U.S.C. § 160(e)–(f); *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 469 (6th Cir. 2019). Substantial evidence "is more than a mere scintilla, but means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Urias-Orellana v. Bondi*, 146 S. Ct. 845, 850 (2026) (citation modified). We do not disturb the Board's findings just because "we may have reached a different conclusion" in the first instance. *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 304 (6th Cir. 2012). And we are "even more deferential" to the Board's credibility determinations, which we will adopt unless they "are inherently unreasonable or self-contradictory." *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019) (quotation omitted).

**III.**

Rieth-Riley contends that the Board erred by: (1) finding that the Union timely withdrew from multiemployer bargaining, (2) finding that the company committed unfair labor practices, (3) finding that those practices motivated a strike, and (4) issuing an affirmative bargaining order preventing any attempt at Union decertification.  We address each argument in turn.

**A.**

In 1935, Congress enacted the NLRA to address "[t]he inequality of bargaining power between employees . . . and employers."  29 U.S.C. § 151.  To that end, § 7 of the NLRA grants employees "the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing."  *Id.* § 157.  Employees are entitled to exercise these rights free from "interfere[nce]" or "restrain[t]."  *Id.* § 158(a)(1).  Generally, an employer cannot refuse to bargain collectively with its employees' representative, nor can the employees' representative refuse to bargain collectively with an employer.  *Id.* § 158(a)(5), (b)(3).  And both sides must bargain in good faith.  *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958).

But employers and unions need not bargain over everything.  If certain matters do not concern a mandatory subject of bargaining, such as "wages, hours, and other terms and conditions of employment," 29 U.S.C. § 158(d), then the parties do not have to bargain over it, and one side may not "insist" otherwise, *Borg-Warner*, 356 U.S. at 349.

This case implicates multiemployer bargaining.  As the name suggests, multiemployer bargaining involves multiple employers that bargain as a unit with a union.  A classic example is the National Football League.  Each NFL team is a separate employer.  But all the teams operate together as a single unit to bargain with the union that represents NFL players.  *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 234–35, 240 (1996).  Although the NLRA does not mention multiemployer bargaining, the Supreme Court has described it as "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining."  *NLRB v. Truck Drivers Loc. Union No. 449*, 353 U.S. 87, 95 (1957).

But membership in a multiemployer bargaining unit is voluntary. *Universal Insulation Corp. v. NLRB*, 361 F.2d 406, 408 (6th Cir. 1966).

The scope of a bargaining unit is a nonmandatory bargaining subject. *Don Lee Distrib., Inc. v. NLRB*, 145 F.3d 834, 842–43 (6th Cir. 1998). Thus, it is generally unlawful for a multiemployer unit to insist on multiemployer bargaining with a union. *Id.* In fact, until the Board's decision in *Retail Associates, Inc.*, 120 NLRB 388 (1958), employers and unions could withdraw from a multiemployer bargaining arrangement with impunity (even after bargaining had commenced). *See Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 410 (1982).

In *Retail Associates*, the Board placed some limits on when employers or unions can withdraw from multiemployer bargaining units. Now, neither an employer nor a union can withdraw "from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations." *Retail Assocs.*, 120 NLRB at 395. The Supreme Court reads *Retail Associates* to allow "any party to withdraw [from a multiemployer unit] prior to the date set for negotiation of a new contract or the date on which negotiations actually begin, provided that adequate notice is given." *Bonanno Linen*, 454 U.S. at 410–11. In other words, there are no "barriers to withdrawal prior to bargaining." *Id.* at 412.

Permitting either side to withdraw from a multiemployer unit "after negotiations commence might well lead to a breakdown of the unit." *NLRB v. Sheridan Creations, Inc.*, 357 F.2d 245, 247–48 (2d Cir. 1966). So when multiemployer bargaining has begun, the Board does not countenance withdrawing from the unit unless "'mutual consent' or 'unusual circumstances' exist." *Bonanno Linen*, 454 U.S. at 411 (quoting *Retail Assocs.*, 120 NLRB at 395).

The Union timely withdrew from the multiemployer unit. True, the Union did not notify MITA that it wanted to terminate the Road Agreement before the contract-modification deadline—at least 60 days before the agreement's expiration date. The agreement expired on June 1, 2018. The Union sent notice of its intention to terminate the agreement on May 2, about 30 days before the expiration date. But this is irrelevant. What matters is that the Union notified MITA of its intent to withdraw from the Road Agreement *before* negotiations on a new

agreement began.  Nothing more was required to withdraw from the multiemployer unit.  *See Bonanno Linen*, 454 U.S. at 410–11.  And because the size of a bargaining unit is not a mandatory bargaining subject, *see Don Lee*, 145 F.3d at 842–43, neither MITA nor Rieth-Riley could continue to insist upon multiemployer bargaining.

Rieth-Riley pushes back.  But none of its counterarguments persuades us.

*First*, the company argues that the Board failed to follow *Retail Associates*.  On Rieth-Riley's read, if the parties to a multiemployer unit have not set a date for bargaining, the contract-modification deadline controls when a party can withdraw from the unit.  Here, the parties never set a date to begin multiemployer bargaining.  So, according to Rieth-Riley, the Union had to withdraw by the contract-modification deadline to properly withdraw from the arrangement.

We must "carefully scrutinize" whether "the Board failed to abide by [its own] precedent." *Kellogg Co. v. NLRB*, 840 F.3d 322, 327 (6th Cir. 2016).  Of course, the Board may choose to abandon an old rule in favor of a newer one.  But if it does so, that departure must be "explicitly [done] and rationally justified." *Kindred Nursing Ctrs. E., LLC v. NLRB*, 727 F.3d 552, 560 (6th Cir. 2013) (quotation omitted).

The Board made no such departure.  It has consistently tied a party's ability to withdraw from a multiemployer unit to the commencement of negotiations by barring withdrawal after "actual bargaining negotiations based on the existing multiemployer unit have begun." *Retail Assocs.*, 120 NLRB at 395.  So has the Supreme Court.  *See Bonanno Linen*, 454 U.S. at 410–11.  And we have said that members of a multiemployer bargaining group can withdraw at any time before bargaining has commenced.  *Carpenters Loc. Union No. 345 Health & Welfare Fund v. W.D. George Constr. Co.*, 792 F.2d 64, 69 (6th Cir. 1986).  Rieth-Riley points to nothing that says otherwise.

*Second*, Rieth-Riley purports to rely on the tools of statutory construction to argue that, even though *Retail Associates* allows parties to withdraw from a multiemployer unit before a contract-modification deadline *or* before negotiations begin, any such withdrawal attempt must occur before the onset of *both*.  We do not, however, read judicial opinions like statutes.  *See St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). This same rationale applies to our review of a Board decision like *Retail Associates*. Yet even if we apply traditional rules of statutory interpretation, Rieth-Riley fails to show why *Retail Associates*'s use of the disjunctive "or" should be read as the conjunctive "and" in the context of withdrawing from a multiemployer unit. 120 NLRB at 395. The use of the disjunctive indicates that *Retail Associates* allows parties to withdraw in either of two circumstances, not by satisfying both conditions. *See United States v. Woods*, 571 U.S. 31, 45 (2013) (noting that "ordinary use" of "or" "is almost always disjunctive").

Rieth-Riley claims that the Board's decision in *Lenox Grill*, 170 NLRB 1027 (1968), supports its interpretation of *Retail Associates*. We disagree. In *Lenox Grill*, the Board concluded that an employer timely withdrew from a multiemployer unit because it provided notice of its withdrawal "in advance of *either* the contract expiration date or the date set for negotiations." 170 NLRB at 1027 (emphasis added). *Lenox Grill* simply reaffirms that satisfying either requirement suffices to withdraw from a multiemployer unit.

*Third*, Rieth-Riley contends that the Union's withdrawal was untimely because the parties had already begun negotiating a successor agreement when it attempted to withdraw. To support this argument, Rieth-Riley points to a series of meetings held between the Union and multiple employers in mid-to-late 2016. Rieth-Riley maintains that these discussions show that negotiations for a successor to the Road Agreement were already underway when the Union gave notice of its withdrawal in May 2018.

Substantial evidence supports the Board's contrary conclusion. Notably, MITA representative Mark Johnston testified that routine general-purpose meetings were held to discuss open issues, not to comb over specific contracting points. And emails from that timeframe confirm that discussions were "from the 10,000 ft. view point." A.R. 3250. Johnston also testified that "MITA sent a letter in [spring 2018] asking for us to start negotiations and [Stockwell] sent a letter back saying he wasn't or wouldn't." *Id.* at 1035. Moreover, an email from MITA's executive vice president in April 2018 further corroborates that the communications were to schedule "dates to begin discussions." *Id.* at 3289.

The company also points to the Union's February 21 letter to MITA, which mistakenly included reopener language, arguing that it caused real confusion as to the Union's position on bargaining.  But this misses the mark.  Even if Rieth-Riley believed that the Union was willing to negotiate on a multiemployer basis, such negotiations had not yet begun by the time the Union clarified its stance in May 2018.

*          *          *

In sum, we agree with the Board's determination that the Union timely withdrew from multiemployer bargaining on May 2, 2018.  Precedent indicates that the Board properly construed and applied *Retail Associates*, and substantial evidence supports the Board's finding that negotiations had not commenced before the Union's notice of withdrawal.

**B.**

We turn next to consider whether the Board erred in finding that the company committed certain unfair labor practices.  The Board found that Rieth-Riley violated § 8(a)(1) and (5) of the NLRA by insisting that the Union engage in multiemployer bargaining, granting wage increases in 2018 and 2020 without bargaining with the Union, clawing back benefit-fund contributions from employees without bargaining with the Union, and locking out its bargaining-unit employees in 2018.

Because the Union timely withdrew from the multiemployer unit, Rieth-Riley violated the NLRA when it improperly: (1) insisted on multiemployer bargaining after the termination of the Road Agreement, (2) increased wages for bargaining-unit employees in July 2018, and (3) locked out members of the bargaining unit in September 2018.  Rieth-Riley does not argue otherwise.  That leaves us to address only Rieth-Riley's clawback of benefit-fund contributions and its grant of wage increases in 2020, both of which Rieth-Riley carried out without bargaining with the Union.

**1.**

We turn first to Rieth-Riley's clawback of fringe-benefit contributions from bargaining-unit employees.  As of fall 2018, Rieth-Riley remained obligated to bargain in good faith with

the Union "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).  An employer commits an unfair labor practice by altering these matters without bargaining with the union.  *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991). Rieth-Riley does not dispute that it made a unilateral decision to claw back certain contributions from its employees' paychecks to replenish the benefits funds.  Instead, it argues that an economic exigency excused its obligation to bargain over its claw-back decision.

An employer cannot implement unilateral changes for mandatory subjects of bargaining except "when economic exigencies compel prompt action."  *Bottom Line Enters.*, 302 NLRB 373, 374 (1991).  There are two categories of exigencies.  The first category typically occurs when a "major economic effect [requires] the company to take immediate action."  *RBE Elecs. of S.D., Inc.*, 320 NLRB 80, 81 (1995) (quotation omitted).  For this category, the employer is not required to bargain before acting.  *Id.*  The second category involves other less "dire" circumstances that are "not sufficiently compelling to excuse bargaining altogether," but that "require prompt action" and "cannot await" final agreement.  *Id.* at 81.  For these lesser economic exigencies, employers must demonstrate that "time [was] of the essence" and that the alleged exigency "demand[ed] prompt action."  *Id.* at 82.  An employer may invoke the lesser-economic-exigency exception to bargaining only when the exigency "was beyond the employer's control, or was not reasonably foreseeable."  *Id.* (citation modified).  And the employer still must give the union "adequate notice and an opportunity to bargain."  *Id.*

The employer must prove economic exigency.  Employers bear "a heavy burden," as "economic exigency requires a compelling business justification."  *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 755 (6th Cir. 2003) (citation modified).  "Mere business necessity" is insufficient.  *Id.* (citation modified).

Rieth-Riley says that its decision to claw back benefit contributions implicates the lesser-economic-exigency exception.  If so, the company would have satisfied its statutory obligations to bargain in good faith "by providing adequate notice and an opportunity to bargain over the changes it propose[d] to respond to the exigency and by bargaining to impasse over the particular matter."  *RBE Elecs.*, 320 NLRB at 82.  And under such time-sensitive circumstances, the bargaining "need not be protracted."  *Id.*

Substantial evidence supports the Board's finding that Rieth-Riley did not face an economic exigency.  On October 11, 2018, Rieth-Riley notified the Union of its intent to recoup from employees "vacation and holiday benefits paid directly to the employees" from June to September 2018 and invited the Union to bargain.  A.R. 2951.  The company stated that it would begin clawing back the funds just four days later.  The company further communicated to the Union that it "ha[d] recently learned" that it was in a § 9(a) relationship with the Union rather than a § 8(f) relationship.  *Id.* at 2954.

The Union then sought to negotiate the fringe-benefit issue.  But Rieth-Riley responded that it would initiate the clawback before the end of the month.  And it in fact did so despite knowing since the summer of 2018 (and by no later than September 10, 2018) that the company had a § 9(a) bargaining relationship with the Union, which required it to maintain the status quo following the lapse of the Road Agreement.  In other words, Rieth-Riley knew at least a month before its October 11 letter that it needed to continue contributing to its employees' benefits funds.  Yet, despite this knowledge, the company perpetuated its own economic crisis by paying the contributions to its employees rather than the funds.  Thus, the purported economic exigency was not beyond Rieth-Riley's control and, at a minimum, it was reasonably foreseeable.

Because Rieth-Riley failed to prove an economic exigency, its clawback of benefit-fund contributions violated § 8(a)(1) and (5) of the NLRA.  As the ALJ put it, "[t]he length of time that elapsed before [Rieth-Riley] acted contradicts the claim that time was of the essence and an economic exigency existed."  *Id.* at 4642.

Rieth-Riley resists this conclusion, claiming that its need to comply with the Davis-Bacon Act created the economic exigency.  That law requires Rieth-Riley to pay prevailing wage rates to its employees.  40 U.S.C. § 3142.  But Rieth-Riley's desire to comply with the Davis-Bacon Act has no bearing on the economic-exigency analysis because the company created the problem by choosing to pay the benefit contributions directly to its employees.  And, at a minimum, Rieth-Riley reasonably foresaw the contribution issue upon being reminded, at least a month before it initiated the claw-back effort, that it was in a § 9(a) relationship with the Union.

Rieth-Riley also argues that it provided adequate notice of the clawback to the Union. But providing notice helps only if Rieth-Riley can show that it faced an economic exigency. As explained above, it failed to meet that burden.

Rieth-Riley further argues that the Union waived its right to bargain about the clawback issue by not timely demanding to negotiate. But substantial evidence supports the Board's finding that there was no waiver. Stockwell, the Union's business agent, opposed the claw-back effort and asked Rieth-Riley to discuss the matter during negotiations.

**2.**

Rieth-Riley also challenges the Board's finding that it committed an unfair labor practice by increasing wages for bargaining-unit employees in 2020 without bargaining with the Union. An employer must bargain with its employees' representative about wages. 29 U.S.C. § 158(d). When an employer unilaterally changes represented employees' wages, it "minimizes the influence of organized bargaining" by suggesting to employees that there is no need for a union. *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945). So an employer must provide the union with "notice and an opportunity to bargain" before making changes to wages. *NLRB v. Talsol Corp.*, 155 F.3d 785, 795 (6th Cir. 1998). An employer thus commits an unfair labor practice when it enacts wage increases without bargaining with the union, *Litton Fin.*, 501 U.S. at 198, "for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal" to bargain, *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

Rieth-Riley does not dispute that it increased wages for bargaining-unit employees in 2020 without providing the Union notice or an opportunity to bargain. The company argues, instead, that it was excused from its duty to bargain about the wage increases because it subjectively believed the Davis-Bacon Act mandated the raise.

Rieth-Riley asks us to make two assumptions: (1) that the Davis-Bacon Act required Rieth-Riley to implement wage increases in 2020, and (2) that the company believed it had to implement the raise. Even so, Rieth-Riley's unilateral action violates § 8(a)(5) for two reasons. One, Rieth-Riley admitted that it had deep familiarity with the requirements of the Davis-Bacon Act before 2020. And two, the company had routinely consulted the Union beforehand to

bargain over similar wage increases.  Rieth-Riley therefore had reason to know that bargaining still played a pivotal role in complying with the Davis-Bacon Act, as an increase in compensation could entail many "options, including different benefit increases," which required the Union's input.  A.R. 4639.  So Rieth-Riley "had some choices over which the parties could have bargained" prior to implementing the wage increase.  *See Trojan Yacht*, 319 NLRB 741, 743 (1995).

Considering this, substantial evidence supports the Board's determination that Rieth-Riley violated the NLRA by unilaterally increasing its employees' wages in 2020.

**C.**

The NLRA protects employees' right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Concerted activities include "the right to strike."  *Id.* § 163; *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 779 (2023).

There are two types of strikes.  One type is an unfair-labor-practice strike.  In an unfair-labor-practice strike, the employees are motivated, at least in part, by the employer's unfair labor practice.  *Calex Corp. v. NLRB*, 144 F.3d 904, 911 (6th Cir. 1998).  Importantly, participating strikers in an unfair-labor-practice strike can be neither discharged nor permanently replaced.  So, when the strike ends, "the employer must discharge any replacements in order to accommodate returning strikers."  *Belknap, Inc. v. Hale*, 463 U.S. 491, 493 (1983).  The second type is an economic strike.  Employees participating in an economic strike are motivated by bargaining demands and other economic concessions, such as higher wages, shorter hours, or better working conditions.  *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180–81 (1967).  Employers cannot fire those exercising their right to strike, though these economic strikers are not entitled to have their jobs back if their employer replaces them.  *See Belknap*, 463 U.S. at 493.

"The nature of a strike is a factual issue on which the Board's findings are conclusive if supported by substantial evidence on the record as a whole."  *Columbia Portland Cement Co. v. NLRB*, 915 F.2d 253, 259 (6th Cir. 1990).  So we defer to the Board's factual findings, acceding

"even more [so]" to its credibility determinations. *Airgas*, 916 F.3d at 560. Importantly here, "[t]he Board is free to find facts and draw inferences different from those of the ALJ," but when it does so, we have "an obligation to examine more carefully the evidence in cases where a conflict exists." *Jolliff v. NLRB*, 513 F.3d 600, 607 (6th Cir. 2008) (quotation omitted).

The Board found that the Union's 2019 strike was motivated in part by Rieth-Riley's unfair labor practices. In doing so, the Board reversed the ALJ's determination that the strike was economic only. Rieth-Riley contends that the Board erred.

Substantial evidence supports the Board's determination that the 2019 strike was at least partly motivated by Rieth-Riley's unfair labor practices. The Union's witnesses testified at the hearing before the ALJ that, at the July 2019 membership meeting before the strike, multiple employees complained about backpay issues stemming from the September 2018 lockout. These witnesses noted that even though the lockout occurred nearly a year beforehand, employees complained about the lingering financial toll. The NLRB's General Counsel also filed an unfair-labor-practice complaint against Rieth-Riley just two months before the strike. The Union addressed the complaint at the July 2019 meeting to inform employees about the grounds of the complaint. And it is undisputed that picket signs and related paraphernalia from the strike identified the lockout as a reason for the protest. Because the company's 2018 lockout was an unfair labor practice, sufficient evidence exists connecting the lockout to the strike. *See Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820–21 (6th Cir. 1975) (noting that an unfair-labor-practice strike may be found where the employer's unfair practices are "contributing causes," even if they are not the primary reason).

Rieth-Riley makes several arguments in response. None, however, overcomes the company's "burden . . . to show that the strike would have occurred even if [the company] had not committed unfair labor practices." *Id.* at 820.

*First*, Rieth-Riley argues that the Board should not have relied on testimony from Union representatives because no employee from the bargaining unit testified during the hearing before the ALJ. The company assumes that because there was no testimony from a striking employee, the Board had no choice but to accord little weight to testimony from Union representatives.

Granted, the Board should accord the testimony of a union official less weight when situated against "the strikers' own characterization of their motive" to strike. *In re 3D Enters. Contracting Corp.*, 334 NLRB 57, 75 (2001). But nothing requires the Board to hear employee testimony when determining the rationale behind a strike. *See N. Am. Coal Corp.*, 289 NLRB 788, 791 (1988) (finding that employees engaged in an unfair-labor-practice strike even though "the record [conveyed] nothing about the thoughts of the employees . . . as they went out on strike"). As a result, the Board did not err by crediting testimony from Union representatives in deciding whether the 2019 strike was motivated by Rieth-Riley's unfair labor practices.

*Second*, Rieth-Riley contends that Union testimony was unreliable because it was hearsay. The hearsay rule prohibits the admission of statements made by absent declarants where "a party offers [them] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Board must conduct its hearings "so far as practicable" in accordance with the Federal Rules of Evidence. 29 U.S.C. § 160(b). But it need not "strictly adhere" to those rules. *3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 666 (6th Cir. 2003). The ultimate question is "whether the relaxation of the Federal Rules of Evidence . . . was reasonable under the circumstances and limited in its application to the practicalities of th[e] situation." *Conley v. NLRB*, 520 F.3d 629, 640 (6th Cir. 2008) (per curiam). Rieth-Riley fails to identify any supposed hearsay statements in its appellate brief. And to the extent the Board considered hearsay in its analysis, Rieth-Riley failed to grapple with whether the Board reasonably relaxed the hearsay rule or limited the application of the evidentiary rules based on the practicalities of the situation. *See id.*

*Third*, Rieth-Riley claims that the Board should not have credited the Union officials' testimony because it conflicted with other evidence. "[I]n examining the union's characterization of the purpose of the strike, the Board and the court must be wary of self-serving rhetoric of sophisticated union officials and members inconsistent with the true factual context." *C-Line Express*, 292 NLRB 638, 638 (1989) (quoting *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1080 (1st Cir. 1981)). Rieth-Riley says that the Union did not conduct a vote to strike before doing so, and that the strike occurred in the thick of collective-bargaining negotiations. But neither point undermines the fact that the Union had authority to strike and that the strike

was at least partially motivated by Rieth-Riley's unfair labor practice.  Because no evidence undermines the testimony of the Union officials, the Board could rely on it in determining that an unfair-labor-practice strike had occurred.

**D.**

Rieth-Riley challenges the Board's sua sponte decision to issue an affirmative bargaining order.  But Rieth-Riley failed to raise this challenge before the Board.  So we lack jurisdiction to consider it.  *See Quickway Transp., Inc. v. NLRB*, 117 F.4th 789, 818 (6th Cir. 2024).

Section 10(e) of the NLRA states: "No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  29 U.S.C. § 160(e).  This jurisdictional bar applies to actions taken by the Board sua sponte, *see Van Dorn Plastic Mach. Co. v. NLRB*, 881 F.2d 302, 306 (6th Cir. 1989), that could have been raised in "a petition for reconsideration or rehearing," *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).

Rieth-Riley did not object to the Board's bargaining order through a petition for reconsideration or rehearing.  Nor has the company identified any "extraordinary circumstances" that would excuse its failure to do so.  29 U.S.C. § 160(e).

**IV.**

For the reasons above, we **DENY** Rieth-Riley's petition for review and **GRANT** the Board's cross-application for enforcement of its order.